## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **REGINA HEBERT** | |
| **Versus** | **CIVIL ACTION NO.** |
| **DR. BEAU CLARK,** in his individual and official capacity as Coroner for East Baton Rouge Parish; **MIKE POZZI**, in his individual and official capacity; **SHANE EVANS**, in his individual and official capacity; and **ABC INSURANCE COMPANIES**, Defendants. | |

## COMPLAINT

**NOW, INTO COURT**, through undersigned counsel, comes Plaintiff, REGINA HEBERT ("Hebert"), respectfully states as follows:

### INTRODUCTION

1.

This action is brought under 42 U.S.C. § 1983 and Louisiana tort law to redress the violation of Plaintiff's constitutional and statutory rights, and the extreme emotional distress caused by Defendants' failure to properly investigate the suspicious death of Plaintiff's son, Dylan Blake McClendon, in accordance with Louisiana law.

2.

Dylan died on November 20, 2018, at a sober living facility in Baton Rouge, Louisiana, under circumstances suggestive of criminal conduct. Despite statutory mandates,

1

Defendants failed to conduct an autopsy. Notably, although no autopsy was performed, staples[1] were later found on Dylan's chest.

### 3.

Defendants acted with deliberate indifference and blatant disregard for their duties mandated under Louisiana law, to Plaintiff's rights, and to Dylan's death, resulting in the destruction of evidence, the collapse of a criminal prosecution, and years of preventable lasting emotional suffering to Plaintiff.

## JURISDICTION AND VENUE

### 4.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

### 5.

This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

### 6.

Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to Plaintiff's claims occurred in the Middle District of Louisiana.

---

[1] The surgical staples were not visible in any of the limited scene photographs provided by the Coroner's Office, all of which showed Dylan clothed or partially covered. The staples were first observed by nine members of Dylan's immediate family, including Plaintiff, on November 21, 2018, during a private viewing of his body at the funeral home. Dylan was covered with a white sheet from the chest down. When Plaintiff and Dylan's father pulled the sheet down to view his chest and neck, they immediately saw the staples. At that time, the family was under the impression that an autopsy had been performed and did not question the presence of the staples until several weeks later.

## PARTIES

7.

Plaintiff REGINA HEBERT is a person of the age of majority domiciled in Ascension Parish, Louisiana. She is the biological mother of the decedent, Dylan Blake McClendon.

8.

Defendant MIKE POZZI is an individual of the full age of majority who, at all times relevant hereto, was employed by the East Baton Rouge Parish Coroner's Office. He is sued in both his individual and official capacities.

9.

Defendant SHANE EVANS is an individual of the full age of majority who, at all times relevant hereto, held supervisory responsibilities within the East Baton Rouge Parish Coroner's Office. He is sued in both his individual and official capacities.

10.

Defendant DR. BEAU CLARK is an individual of the full age of majority and, at all times relevant hereto, was the elected Coroner for East Baton Rouge Parish and the final policymaker responsible for the conduct of the Coroner's Office. He is sued in both his individual and official capacities for acts and omissions that resulted in the deprivation of Plaintiff's rights under state and federal law.

11.

Defendants ABC INSURANCE COMPANIES are fictitious entities whose true names are unknown at this time but who, upon information and belief, provided insurance coverage to the Coroner's Office and/or its employees including the named defendants during the relevant period, which covers each count alleged below.

3

## FACTUAL ALLEGATIONS

12.

Dylan Blake McClendon, age 23, died on November 20, 2018, at 6135 Antioch Boulevard in Baton Rouge—a residence used as an unlicensed sober living facility known as Silver Lining Transitional Living, LLC. Dylan had recently completed inpatient treatment at Victory Addiction Recovery Center and moved into Silver Lining in hopes of maintaining his recovery. Dylan's family was unaware that Silver Lining was not a licensed treatment center but a loosely organized group home without regulation, staff training, or medical supervision.

13.

Days before his death, Dylan warned his family about troubling conditions in the house. He texted his parents that a fellow resident had relapsed and used heroin in the home. On November 19, 2018, he sent a message saying he had stayed up all night, fearful of his environment. That evening, Dylan spoke to his stepmother and sounded anxious.

14.

On the evening of November 18, 2018, two days before Dylan's death, his roommate Baylor Johnson allegedly overdosed on heroin obtained from a known local dealer. Dylan disclosed this event to his father the following day, stating that Baylor had experienced a drug episode in the house. This disclosure is consistent with contemporaneous text messages Dylan sent to both of his parents, expressing fear, frustration, and concern over Baylor's condition. Dylan documented that he wanted to report the incident to the house manager but feared Baylor would be evicted. In those messages, Dylan indicated that he told Baylor to either report the overdose himself or Dylan would do so the following day. That day never came. Phone records and witness statements obtained through independent investigation show extensive communications on November 18 and 19 between Baylor Johnson, Lambert

4

Louviere, Tyler Castro, and the heroin supplier. Louviere's phone records show that he acted as the intermediary and transportation for those seeking heroin. These events reflect a coordinated plan to acquire narcotics involving multiple individuals at the sober living facility—facts which should have prompted immediate and thorough investigation by both law enforcement and the coroner's office.

15.

At approximately 1:04 a.m. on November 20, 2018, a roommate called 911 to report Dylan had ingested heroin and was unresponsive.

16.

EMS arrived and noted signs of lividity, rigor mortis, and cyanosis. Dylan was declared dead on scene.

17.

EMS personnel reported that another resident at the scene informed them that he and Dylan had snorted heroin powder earlier that night. This information was conveyed to responding law enforcement and the Coroner's Office.

18.

Coroner Investigator Mike Pozzi was notified at 1:12 a.m. and arrived at 2:16 a.m. The scene was already being investigated by law enforcement, including deputies and detectives. Pozzi met with them but did not review witness statements, interview residents, or consult the homicide unit.

19.

Pozzi's own report noted that Dylan was discovered face down on the floor in gym shorts and a T-shirt. There was opaque reddish froth coming from his nose and mouth, fixed

and dilated pupils, significant petechial hemorrhaging, and significant lividity on the front of his body. A reddish stain near the head indicated that Dylan had originally been face down. Pozzi's notes reflect moderate lividity on the chest, shoulders, and head, consistent with having been found prone. He later wrote that the lividity was persistent and blanching. Although petechial hemorrhaging is not commonly associated with opioid overdose, it is a well-recognized indicator of asphyxia—one that Pozzi noted but failed to investigate.

20.

Pozzi did not order an autopsy, even though Louisiana law mandates one for suspected overdose, death without known natural cause, or any death that may involve criminal activity. Instead, he declared the manner of death "accidental" and cause of death "multidrug toxicity," without waiting for toxicology reports.

21.

He did draw urine and blood for testing, but toxicology results were never reviewed before certifying the death. His report did not document any medical or psychiatric history, known last alive time, or complete social history. Dylan's ID was verified by a cohabitant and a driver's license found in the room. No family member was contacted before Pozzi completed and closed the investigation.

22.

Pozzi photographed the scene and placed Dylan's body in cold storage. Dylan was transported in a black disaster pouch. The family later discovered that despite no autopsy, Dylan's body had visible surgical staples on his chest, suggesting an invasive procedure was performed postmortem, despite no autopsy being documented or disclosed.

23.

The Coroner's Office listed Dylan's official time of death as 2:16 a.m. on November 20, 2018—the time Investigator Pozzi declared him deceased—not the actual time of death. However, EMS reports and witness statements contradict this. When emergency personnel arrived at approximately 1:10 a.m., Dylan was already cold to the touch, showed signs of lividity, and exhibited cyanosis. EMS personnel made no attempt at resuscitation. Witnesses at the scene also reported Dylan had been unresponsive and cold prior to their call. In later interviews, both Shane Evans and Michael Pozzi admitted that, based on their training and the condition of the body, Dylan had likely been dead for four to six hours before being found. These observations were corroborated by an independent forensic investigator. Nonetheless, no forensic tools—such as body temperature probes or vitreous sampling—were used to estimate the true time of death. This failure deprived Plaintiff of a reliable forensic timeline and further undermined the credibility of the coroner's official findings.

24.

Despite the absence of an autopsy and the lack of a complete forensic investigation, the East Baton Rouge Parish Coroner's Office issued Dylan McClendon's death certificate on November 21, 2018—just one day after his death. The certificate attributed his death to accidental "multi-drug toxicity." However, the full toxicology report from NMS Laboratories was not completed or received by the coroner's office until November 28, 2018, a full week later. In other words, the official cause and manner of death were certified before the coroner had reviewed the only forensic evidence available. Dylan's body was buried before the report was completed. The premature issuance of the death certificate was not based on medical

certainty, but on assumptions unsupported by forensic data—assumptions later adopted and relied upon by other agencies in their criminal investigations.

25.

The Coroner's Office also failed to perform even the most basic forensic examination of Dylan McClendon's body. No autopsy was conducted, and there is no indication that a physician or investigator ever examined Dylan's body unclothed, photographed it for trauma documentation, or attempted to determine time of death using standard forensic tools such as liver temperature or vitreous potassium analysis. These techniques, while not exact, are commonly accepted methods used to estimate time of death in forensic pathology and are part of standard coroner protocols. According to Chief Investigator Shane Evans, all investigators were trained in forensic death investigation procedures, yet none of those tools or practices were used in Dylan's case. When asked, Evans refused to confirm whether any internal examination or photographic documentation of the unclothed body had occurred. The absence of this most basic forensic work eliminated any chance of establishing an accurate cause, manner, or time of death and further deprived Plaintiff of the ability to verify or challenge the conclusions reached by the Coroner's Office.

26.

When asked why no autopsy had been performed despite the suspicious circumstances and statutory requirements, Chief Investigator Shane Evans explained that in 2017, the Coroner's Office had "modified procedures" due to an "explosion of overdoses" and a limited-capacity contract pathologist. Evans stated that, under this adjusted approach, autopsies were typically forgone if the scene suggested drug use and urine samples could be obtained for toxicology. This policy was not based on statute, medical necessity, or written

guidelines, but solely on capacity constraints and internal discretion. Evans admitted that there were no written documents or protocols establishing the parameters of this policy, how it was to be applied, or who had discretion to override it. The absence of a formal policy and the use of resource-based triage to replace mandatory legal obligations underscore the systemic indifference that led to Dylan's death being treated without forensic rigor or legal compliance.

27.

Independent investigation and phone records reveal that on November 19, 2018, a coordinated plan was executed by residents of the sober living facility—including Lambert Louviere, Baylor Johnson, and Tyler Castro—to obtain heroin from a known dealer. Text messages and phone records show that Louviere, who had access to a vehicle and acted as the liaison to the drug dealer, was in constant contact with both the supplier and the residents throughout the day and night of November 19. These facts were available to law enforcement and the Coroner's Office or could have been uncovered with minimal investigation. The existence of a multi-party drug acquisition effort—culminating in a death inside a recovery residence—was a clear indicator of potential criminal conduct contributing to the death and should have triggered mandatory autopsy procedures under Louisiana law.

28.

Regina Hebert, Dylan's mother, was not informed that an autopsy had not been conducted. She learned of this only much later, after submitting public records requests and meeting with officials. At no time did the Coroner's Office or its staff notify Plaintiff that an autopsy had not been performed, nor was she advised of her legal right to seek an independent autopsy through a private pathologist. Had she been given that option, Plaintiff would have

exercised it immediately. In seeking answers about Dylan's death, Plaintiff eventually discovered that Investigator Pozzi had never consulted the homicide division and had issued the death certificate without reviewing the toxicology report.

29.

In a 2024 meeting with Ms. Hebert, Pozzi admitted these failures. He acknowledged that he should have consulted law enforcement, reviewed toxicology, and possibly ruled the death differently. When asked why he never spoke with the homicide division, Pozzi stated, "It's not my job to talk to the detectives on what they have—my job is strictly the body." When informed that Detective Henning and his team had obtained statements indicating that Dylan had been alert and playing video games only 20 minutes before the 911 call, Pozzi admitted, "I didn't know that, and that definitely would have changed my decision." He also disclosed that there was an informal policy in the Coroner's Office to avoid autopsies in overdose cases, despite clear statutory mandates. That policy was not written, reviewed, or made known to the public.

30.

Pozzi further admitted that, on his way to the scene, he knew the location was a sober living facility and assumed the death was an overdose. He also acknowledged that the shift on which he responded was his last before taking time off for the Thanksgiving holiday, and that he wanted the death certificate completed before his shift ended so he would not be bothered while away. Finally, Pozzi stated that he never reviewed the toxicology report from Dylan's arterial blood draw until it was shown to him in 2024. Upon reviewing it, he was surprised to find that the toxicology results revealed no lethal dose and described the levels as "extremely small."

31.

In response to a public records request, Chief Investigator Shane Evans admitted that the East Baton Rouge Parish Coroner's Office had internally "modified procedures in 2017" due to the increase in overdose deaths. Specifically, he acknowledged that the office had adopted a practice of not performing autopsies in suspected overdose cases if a urine sample was available and the field-test results were positive for drugs. Evans stated that this policy was based on capacity limitations of the office's contracted pathologist. When pressed to produce documentation of this procedural change or a policy governing when autopsies should be forgone, Evans admitted that no such written policy or protocol existed. The admission of an unwritten, capacity-driven policy to systematically avoid autopsies in overdose deaths—despite statutory mandates to the contrary—demonstrates deliberate indifference to legal obligations and directly contributed to the deprivation of Plaintiff's rights.

32.

Regina Hebert also discovered that law enforcement arrested and charged multiple individuals with murder in connection with Dylan's death. The criminal case was later dismissed due in part to insufficient forensic evidence. Prosecutors cited limitations stemming from the lack of autopsy and the absence of preserved physical evidence. In post-dismissal interviews, one resident reportedly admitted to lying to police.

33.

Detective Henning later confirmed to Plaintiff and her investigator that the homicide investigation was undermined by the lack of autopsy and forensic evidence. He stated that the criminal case was dismissed specifically because the Coroner's Office failed to conduct an

autopsy, collect evidence, or consult with law enforcement. According to Henning, witness statements obtained at the scene were inconsistent and the timeline of events did not add up.

34.

The Coroner's decision to prematurely issue a death certificate effectively ended the criminal prosecution of Dylan's case.

35.

Over six years, Ms. Hebert endured an exhausting and emotionally devastating effort to obtain justice and closure. The Coroner's Office refused to correct the death certificate or to offer a meaningful explanation. The Sheriff's Office and District Attorney offered only limited cooperation. Ms. Hebert still has not received records of interviews with residents, or a complete investigative file.

36.

Regina Hebert has suffered severe emotional trauma due to this failure of public officials to perform even the most basic duties owed to grieving families. She has also been deprived of meaningful access to courts and the ability to hold responsible persons accountable.

37.

Plaintiff did not discover, and could not have reasonably discovered, the factual basis for the claims in this Complaint until sometime in 2024, within one year of the filing of this suit. Critical facts were concealed by Defendants, including the failure to perform a legally required autopsy, the use of an unwritten policy to avoid autopsies in overdose cases, and the issuance of a death certificate unsupported by forensic evidence. It was only after subsequent FOIA responses and direct admissions from Defendants Pozzi and Evans in 2024 that

12

Plaintiff became aware of the full scope of misconduct. Accordingly, prescription is suspended under the doctrine of *contra non valentem* and federal equitable tolling principles.

## CAUSES OF ACTION

### Count I – 42 U.S.C. § 1983

38.

Defendants, under color of state law, deprived Plaintiff of her right of access to courts by destroying or failing to collect critical evidence related to Dylan's death.

39.

Defendant, Mike Pozzi, negligently and deliberately failed to consult homicide investigators, review toxicology, or order an autopsy despite multiple red flags and statutory triggers under La. R.S. § 13:5713. He knowingly closed the investigation prematurely and documented that no autopsy was performed, even though Dylan's body was later discovered to have surgical staples indicating an undocumented invasive procedure.

40.

Defendant Dr. Beau Clark, the final policymaker for the Coroner's Office, permitted or ratified an unwritten policy not to perform autopsies in suspected overdose deaths — a policy that contravenes Louisiana law and had the foreseeable effect of denying families like Plaintiff's the ability to pursue justice. He failed to train, supervise, or discipline Pozzi and has refused to correct the official death record or explain the discrepancy involving the staples.

41.

When asked to produce written documentation of any policy or protocol governing autopsy decisions—particularly in overdose cases—Chief Investigator Shane Evans responded that no such documents existed. In response to follow-up questions, he confirmed

that the Coroner's Office did not issue any internal memos, protocols, or directives establishing how or when autopsies would be forgone under the modified procedures adopted in 2017. Although Evans referenced La. R.S. § 13:5713 as the applicable standard, he acknowledged that the decision to avoid autopsies in overdose cases was based on capacity constraints and internal practice—not legal criteria or medical necessity—and that there were no written guidelines memorializing the policy or controlling its application. The refusal to provide any contemporaneous documentation about the adoption, scope, or application of the policy underscores its ad hoc nature and the Office's systemic disregard for statutory obligations and transparency.

42.

Following Dylan's death, four individuals were arrested and charged with second-degree murder in connection with their roles in procuring and distributing the heroin that allegedly caused his death. These charges were later dismissed due to the lack of sufficient forensic evidence—a direct result of the Coroner's Office's failure to perform an autopsy or collect meaningful time-of-death data. The existence of these criminal charges, filed shortly after Dylan's death, underscores the clear and immediate likelihood that a violation of a criminal statute contributed to his death.

43.

As a result of the Coroner's Office's failure to perform an autopsy, a criminal investigation or determination into whether the cause of death was asphyxiation (e.g. strangulation) was precluded.

44.

Defendant, Shane Evans, in a supervisory capacity, also failed to intervene, oversee the investigation, or correct the resulting denial of Plaintiff's constitutional rights.

45.

Defendants' conduct frustrated Plaintiff's ability to obtain justice in criminal or civil proceedings, including, but not limited to, a determination of whether Dylan died from asphyxiation rather than a drug overdose, violating the First and Fourteenth Amendments.

46.

The Coroner's failure to autopsy overdose cases pursuant to an unwritten, capacity-based policy constitutes an official policy or custom under *Monell*[2] and Plaintiff seeks to hold Dr. Clark liable in his official capacity accordingly.

47.

Plaintiff is entitled to compensatory damages for emotional harm and loss of legal recourse, punitive damages against ABC Insurance Company, and Pozzi, Clark, and Evans in their individual capacities, and reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

**Count II – Negligence (La. C.C. art. 2315)**

48.

Defendants Mike Pozzi, Shane Evans, and Dr. Beau Clark owed Plaintiff Regina Hebert a duty of care under Louisiana law to conduct a proper investigation into the suspicious and likely criminal death of her son, Dylan McClendon. This duty arises from Louisiana's statutory framework, including La. R.S. § 13:5713, and is further supported by

---

[2] *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

general principles of delictual liability under La. C.C. art. 2315. Their conduct must be evaluated in light of moral, social, and economic considerations, including the foreseeability of harm, the fairness in imposing liability, the economic impact on the defendants, and the societal interest[3]—specifically in this case, ensuring proper death investigations and deterring official misconduct.

### 49.

Defendant Pozzi breached that duty by failing to perform a mandatory autopsy despite obvious signs of overdose and suspicious death, issuing a premature and unsupported death certificate, failing to review toxicology results or consult with homicide investigators, and concealing the existence of an invasive procedure evidenced by staples in the chest of Dylan's body.

### 50.

Defendant Clark breached that duty by promulgating or ratifying an unwritten policy not to perform autopsies in overdose cases, despite legal requirements to the contrary, and by failing to train, supervise, or discipline Pozzi. Clark also failed to correct the false documentation or amend the death certificate despite later learning of the discrepancies.

### 51.

Defendant Evans breached his duty by failing to supervise or intervene in the deficient investigation, despite his position of authority within the Coroner's Office and responsibility for oversight.

---

[3] *Carmouche v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 2023-367 (La. App. 3 Cir. 2/7/24), 380 So. 3d 214, 222, writ denied sub nom. Carmouche v. Nat'l Union Fire Ins. Co. of Pittsburgh, 2024-00321 (La. 4/30/24), 383 So. 3d 927.

52.

The conduct of each defendant was a cause-in-fact of the harm suffered by Plaintiff. Had a proper autopsy been conducted, toxicology reviewed, and physical evidence preserved, Plaintiff would have had the opportunity to pursue criminal and civil remedies against those responsible for Dylan's death.

53.

The harm suffered by Plaintiff—including the loss of her son, the obstruction of legal recourse, and years of emotional anguish—is exactly the type of harm that the statutory and common law duties governing death investigations were intended to prevent. Plaintiff's losses fall squarely within the scope of the defendants' duties.

54.

As a direct and proximate result of Defendants' conduct, Plaintiff suffered actual damages, including emotional distress, deprivation of closure, inability to participate meaningfully in the investigation and prosecution of her son's death, and the loss of the opportunity to pursue justice through the courts.

55.

Further, Louisiana's negligence per se doctrine applies to Defendants' violations of La. R.S. § 13:5713 and other statutory mandates, which establish the standard of care owed in cases involving sudden, unexplained, or potentially criminal deaths. Their violations of these statutes support an inference of negligence as a matter of law.

**Count III – Intentional Infliction of Emotional Distress (IIED)**

56.

Defendants Mike Pozzi, Dr. Beau Clark, and Shane Evans engaged in conduct so extreme and outrageous in character, and so atrocious and utterly intolerable in a civilized community, that it constitutes intentional infliction of emotional distress under Louisiana law.

57.

Defendant Pozzi, acting under the color of state law and in his role as Coroner Investigator, failed to order a legally required autopsy despite clear signs of a suspicious death, documented false and misleading information in official death records, closed the investigation within hours, without consulting homicide investigators, and concealed evidence—most notably, failing to account for surgical staples later found in Dylan McClendon's chest despite recording that no autopsy had been performed. These actions, combined with the issuance of a premature and unsupported death certificate, were not only reckless but deliberate in undermining the truth and depriving Plaintiff of closure, trust in the public system, and the ability to pursue legal recourse.

58.

Defendant Dr. Beau Clark, as the Coroner and final policymaker, ratified and enforced an unwritten policy to forego autopsies in suspected overdose deaths, in violation of Louisiana law. He allowed false records to remain uncorrected even after being made aware of them and refused to amend the death certificate or explain the inconsistency related to the staples in Dylan's body. These decisions were made with knowledge that Plaintiff was relying

on the integrity of official records and with indifference to the harm such falsehoods would cause.

59.

Defendant Shane Evans failed to supervise Pozzi and permitted the investigation to be closed without compliance with legal, ethical and professional standards. His omission in the face of gross procedural violations and concealment of key facts allowed the emotional damage to Plaintiff to deepen over time, constituting reckless disregard for her well-being.

60.

All Defendants either intended to cause emotional distress or acted with reckless disregard of the high likelihood that such distress would result. Their conduct went far beyond professional negligence—it involved abandonment of legal duties, concealment of the truth, and obstruction of a grieving mother's search for justice.

61.

As a direct result of this conduct, Plaintiff suffered severe emotional distress, including anguish, depression, loss of trust in public institutions, and years of ongoing psychological trauma. She was denied meaningful closure, was forced to piece together the truth of her son's death through independent investigation and has been deprived of the ability to see justice done for her son.

62.

Defendants are liable for all damages resulting from their intentional infliction of emotional distress.

## Count IV – Negligent Hiring, Training, and Supervision

63.

Defendant Dr. Beau Clark, in his capacity as Coroner and final policymaker for the East Baton Rouge Parish Coroner's Office, owed a duty to the public and to Plaintiff to hire, train, and supervise competent and qualified personnel, and to ensure that employees such as Investigator Mike Pozzi conduct their work in accordance with Louisiana law and basic forensic standards in an ethical and professional manner.

64.

Dr. Clark breached this duty by failing to train Pozzi and other investigators in the requirements of La. R.S. § 13:5713, including when autopsies are legally mandated. He also failed to supervise Pozzi's actions and review his performance, despite clear indicators of systemic failure and legal noncompliance.

65.

This failure directly caused Plaintiff's injuries, including the issuance of a false and unsupported death certificate, the loss of critical forensic evidence, the concealment of invasive postmortem procedures, and the deprivation of Plaintiff's opportunity to seek justice through civil or criminal processes.

66.

Plaintiff's injuries were a foreseeable consequence of Defendants' breach of duty, and she is entitled to all damages recoverable under Louisiana law for the emotional distress, loss of closure, and legal harm suffered as a result.

## Count V – Fraud

67.

Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.

68.

Defendants, particularly Investigator Mike Pozzi and Coroner Dr. Beau Clark, engaged in intentional misrepresentation and suppression of material facts relating to the investigation of Dylan McClendon's death.

69.

Pozzi falsely stated in official documentation that no autopsy was performed, while Dylan's body was later discovered to have staples in the chest consistent with an invasive procedure. Defendants failed to disclose or explain this invasive action and have refused to correct official records or provide an accurate account of the treatment of Dylan's remains.

70.

Defendants also issued a death certificate listing the cause and manner of death as "accidental" based on "multi-drug toxicity" before receiving or reviewing toxicology results, and without consulting with law enforcement or homicide investigators. These false representations were made intentionally, or with reckless disregard for their truth, and were relied upon by Plaintiff, and prosecutors, to their detriment.

71.

Defendant, Dr. Beau Clark, in his capacity as Coroner and final policymaker, suppressed the existence of an internal policy not to conduct autopsies in suspected overdose

deaths. This policy directly contravened Louisiana law and was never disclosed to Plaintiff or the public. Dr. Clark also failed to correct the false narrative created by his subordinate and has refused to amend Dylan's death certificate or clarify the circumstances of the body's postmortem handling.

72.

These misrepresentations and omissions by Pozzi and Clark were made with the intent to avoid legal liability, obstruct justice, and prevented Plaintiff from obtaining redress. Plaintiff reasonably relied upon these falsehoods and suffered harm including emotional distress, loss of closure, and the deprivation of legal rights.

73.

Pozzi and Clark are liable in solido for all damages resulting from their fraudulent conduct.

**Count VI – Declaratory Relief**

74.

Plaintiff seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201, that the East Baton Rouge Parish Coroner—through actions taken by Dr. Beau Clark in his official capacity and by agents under his supervision—violated mandatory statutory duties under La. R.S. § 13:5713 by failing to perform an autopsy in a case where there was criminal activity that contributed to a death. Plaintiff further seeks a declaration that the Coroner's unwritten policy to forgo autopsies in overdose cases is contrary to Louisiana law, and that the failure to establish, maintain, or follow written protocols deprived Plaintiff of legal rights owed under state law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A.   Declare that Dr. Beau Clark, in his official capacity as Coroner, violated Plaintiff's statutory rights under La. R.S. § 13:5713 and that the unwritten policy adopted by the East Baton Rouge Parish Coroner's Office contravenes Louisiana law;

B.   Declare that Defendants violated Plaintiff's constitutional rights under the First and Fourteenth Amendments;

C.   Award compensatory damages in an amount to be determined at trial;

D.   Award punitive damages against Defendants Pozzi, Clark, and Evans in their individual capacities;

E.   Award reasonable attorney's fees and costs under 42 U.S.C. § 1988 and applicable state law; and

F.   Grant such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff respectfully requests trial by jury.

Respectfully submitted,

JONES FUSSELL, L.L.P.

By:  /s/ Andrew J. Walker
     Andrew J. Walker #39056
     P.O. Box 1810
     Covington, LA 70434
     Telephone: 985-893-4801
     Facsimile: 985-235-4327
     E-mail: awalker@jonesfussell.com
     *Attorney for Regina Hebert*